# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ELLEN WEIDAUER,

                              Case No. C-3-07-097

               **Plaintiff,**

-vs-

                              **Judge Thomas M. Rose**

BROADSPIRE SERVICES, INC., et al.,

               **Defendants.**

---

**HONDA AND LUMBERMENS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. #23) IS OVERRULED; WEIDAUER'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. #24) IS GRANTED AND WEIDAUER IS AWARDED LONG TERM DISABILITY BENEFITS UNDER THE "OWN OCCUPATION" DEFINITION OF DISABILITY INCLUDED IN THE POLICY.**

---

      This cause arises from the disability of Plaintiff Ellen Weidauer ("Weidauer"). Before becoming disabled, Weidauer was employed by Honda of America Mfg., Inc. ("Honda") as an Engineering Coordinator. While employed at Honda, Weidauer was provided long term disability ("LTD") coverage under Disability Insurance Policy No. SQH001001 (the "Policy").

      The Policy was issued to Honda by Lumbermens Mutual Casualty Company ("Lumbermens"). It was a part of Honda's Health and Welfare Benefits Plan (the "Plan").

      Weidauer has brought a claim for benefits under the Policy pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. She alleges that she is entitled to LTD benefits and that Honda and Lumbermens wrongfully denied her those LTD benefits.

The Sixth Circuit has directed that claims regarding the denial of ERISA benefits are to be resolved using motions for judgment on the administrative record. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). The court is to conduct its review "based solely upon the administrative record," and evidence outside the administrative record may be considered "only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part."[1] *Id.*

Now before the Court are Motions for Judgment On the Administrative Record submitted by Weidauer and by Honda and Lumbermens. (Docs. #24 and 23.) The Administrative Record ("AR") of this matter has been filed and the Parties have filed responses (Docs. #26 and 27). The AR consists of 687 numbered pages which will be cited as "AR at (page number)."

A factual background taken from the AR will first be set forth. The factual background will be followed by the standard of review for claims to recover benefits due under terms of a plan subject to ERISA and an analysis of the Motions for Judgment On the Administrative Record.

I.      **FACTUAL BACKGROUND**

Weidauer began working at Honda on April 30, 1984. (AR at 159.) She was assigned to an Engineering Coordinator position when she ceased working at Honda.

A.      **The Engineering Coordinator Position**

In the Engineering Coordinator position at Honda, Weidauer typically worked at her desk or visited suppliers. (AR at 109.) If there were bad parts on the assembly line from a supplier that

_____

[1]In this case, there is no alleged lack of due process.

Weidauer was responsible for, she would go to the assembly line to do a parts check. (Id.) If she was required to sort or check parts, help was available for lifting. (Id.) Honda indicates that, while Weidauer's job is not totally sedentary, it does not involve lifting to any extent. (Id.) Broadspire deemed the exertion level of Weidauer's position to be "sedentary." (AR at 362.)

Honda provided Broadspire with a "Position Profile" for a "Business Planning" position. (AR at 364-65.) Honda indicates that this is the position to which Weidauer was assigned. (Id.)

The Business Planning Position Profile identifies Weidauer's primary duties as:

A.     Responsible for business planning - Develop monthly KCP's for MMP PH group. Understand and report gap items to appropriate management and follow-up on c/m's.

B.     Responsible for developing MMP PQ weekly and monthly reports. Gather and report data including gaps c/m activity to close gaps.

C.     Responsible for supplier HTR closure speed - track and understand each suppliers closure speed. Send monthly reports to each supplier and work on understanding and closing gaps.

D.     Responsible to track and close out all MMP PH comp requests within specified time. Understand system and tracking of all requests. Follow-up with appropriate department to assure closure speed.

E.     Responsible to track and schedule MMP PQ training. Develop and maintain training matrix to easily track training for HAM, PH and PQ specific training classes.

F.     Support development and revision of department ISO procedures.

(AR at 365.)

Under the "Required Skills - MUSTS" in the Business Planning Position Profile, Honda listed six:

A. Microsoft skills - Excel, Power Point, etc.
B. Business Planning skills
C. Ability to work as a team member to achieve a common goal.
D. Ability to handle multiple tasks at one time
E. Ability to communicate ideas and opinions
F. Ability to use PQTS system

(Id.)

**B.    Relevant Plan Provisions**

As a result of her employment by Honda, LTD benefits were available to Weidauer under the terms of the Policy. (AR at 23.) The Policy, entitled "Plan Booklet," is included in the AR at pages 023-041. The AR also includes excerpts from a brochure that Honda apparently considers to be its Summary Plan Description for the Plan, including LTD benefits. (AR at 667-687.)

The Policy defines disability as follows:

"Disability" and "Disabled" mean that because of injury or sickness:

1.    You cannot perform:
   a.    Each of the material duties of Your regular occupation; and
   b.    The duties of any position You are eligible for within Your job classification with the Employer or the duties of a Reasonable Employment Option offered by the employer; and

2.    While unable to perform all of the material duties of Your regular occupation, You are:
   a.    Performing at least one of the material duties of Your regular occupation or another occupation on a part-time or full-time basis; and
   b.    Earning currently at least 20% less per month than Your Indexed Pre-disability Earnings due to the same injury or sickness; and

3.    After benefits have been paid for 24 months, You cannot perform each of the material duties of any Gainful Occupation for which You are reasonably fitted by training, education or experience.

The monthly benefit provided by the Policy is equal to 60% of a participant's salary, reduced by other identified income benefits, from 180 days after the date of disability to age 65. (AR 31, 668.) The Plan Booklet provides that, "[p]ayment of benefits is contingent on Your providing proof of loss that We determine to be satisfactory." (AR at 40.) "We" is defined as Lumbermens Mutual Casualty Company. (AR at 29.)  The Plan Booklet also authorizes

Lumbermens to have a claimant examined by a physician, other health professional or vocational expert selected by Lumbermens. (AR at 40.)

The Summary Plan Description provides that, "[t]he plan administrator is the named fiduciary for the purposes of ERISA and has the discretionary authority to interpret the terms of the plan and to perform all other aspects of plan administration, including but not limited to, determining eligibility for benefits." (AR at 671.) Honda is identified as the Plan Administrator. (Id.)

One of the plans identified in the Summary Plan Description is the LTD plan. (AR at 672.) The Summary Plan Description indicates that Kemper National Services is the Plan Administrator and insurer for the LTD plan. (Id.) Thus, according to the Summary Plan Description, Kemper National Services is the Plan Administrator and insurer for Honda's LTD plan.

**C.     Weidauer's Health Conditions and Work History**

Weidauer's medical problems started as early as 1993 when she began experiencing bladder problems as a result of the birth of a child. (AR at 219.) Her initial diagnosis was persistent bladder dysfunction and recurrent urinary tract infections ("UTIs").[2] (AR at 194-95, 260-63.) She was also depressed. (AR at 096.)

Weidauer continued to work but her attendance began to suffer. She missed 45 days of work in 1998, 65 days in 1999, 97 days in 2000, 140 days in 2001 and 139 days in 2002. (AR at 595.)

---

[2]The persistent bladder dysfunction and recurrent urinary tract infections were diagnosed in 2002 as chronic pancreatitis. (AR at 248.)

In December of 2001, Weidauer applied for LTD benefits based primarily upon her "chronic pain in pancreas." (AR 094-95.) This application was denied on February 5, 2002, by Kemper National Services as claim administrator for the Policy. (AR 528-29.) Kemper National Services determined that there were insufficient objective findings of functional impairment from a physical and psychological standpoint to preclude Weidauer from performing the regular duties of her occupation. (Id.)

Weidauer continued to have problems. Weidauer returned to her original occupation with Honda in 2003 but on a part-time basis. (AR at 239.) She continued to work on a part-time basis until September 21, 2004, when she stopped working completely. (AR at 403.) Honda continued to pay Weidauer until March 17, 2005. (AR at 405.)

On March 18, 2004, Dr. Muir, Weidauer's Attending Physician, requested that Weidauer undergo an MRI. (AR at 223.) The results were, among other things, "highly suggestive of multiple sclerosis." (AR at 226.) The results further indicate that, "[o]ther demyelinating processes cannot be entirely excluded, however, are less likely." (Id.) As a result, Weidauer took a leave of absence from work so her physicians could assess and treat the early signs and symptoms of multiple sclerosis. (AR at 206.) However, Dr. Muir indicated that Weidauer could eventually return to work, albeit part time. (AR at 233-40.)

On October 8, 2004, Dr. Muir wrote that Weidauer had been off work due to multiple sclerosis testing and that she would be able to return on November 8, 2004. (AR at 233.) On November 5, 2004, Dr. Muir wrote that Weidauer was under his care and could not return to work for at least three months. (AR 196.) In this letter, Dr. Muir writes that Weidauer needs a multiple sclerosis work-up, has acute chronic bowel and bladder disorder and chronic but

currently stable, pancreatitis. (Id.)  She had multiple tests scheduled with multiple specialists over the next 6 weeks. (Id.)

On June 30, 2005, Dr. Muir writes that Weidauer is under his care and might be able to return to work by October 1, 2005. (AR at 182.) He further indicates that he will be reassessing Weidauer and that she "[m]ay need long term disability re Multiple Sclerosis." (Id.)

**D.      Weidauer's Second Claim for Long Term Disability Benefits**

Weidauer applied for LTD benefits, for the second time, in 2005. The date on her application is May 5, 2005. (AR at 56-57.) On June 27, 2005, Broadspire, alleging to be the claim administrator for the Policy,  informed Weidauer that it had not received her LTD application. (AR at 154.) On July 21, 2005, Broadspire then acknowledged receipt of Weidauer's application for LTD benefits. (AR at 157.)

Honda had continued Weidauer's salary until March 17, 2005. (AR at 159.) She thus became eligible for LTD benefits on March 18, 2005. (Id.)

In her second application for LTD benefits, Weidauer described her illness as, "multiple sclerosis on top of chronic pancreatitis, along w/ 'many' bladder issues / retention causing frequent UTIs, extreme fatigue, restless leg syndrome." (AR at 174.) She indicated that she was unable to work because, "legs give out on me (weak), extreme fatigue where I was falling asleep behind the wheel to & from work & at work! Chronic pain from pancreatitis and my many recurring UTIs from urinary retention." (Id.) Finally, under "additional comments," Weidauer indicated:

> All of my problems added up together is the reason for this claim. I was
> struggling prior to my M/S diagnosis, now this M/S w/ its progression has
> definitely hindered my mobility, and everything about my life. On top of

everything else, I can't continue trying to "act" like I can do everything any more. Work was draining me so bad it continuously had me "down" and sick.

(AR at 175.)

Weidauer's second application was supported by Attending Physician, Dr. Peter Muir. (AR at 59-60.) Dr. Muir indicated that Weidauer had multiple sclerosis (poor control) as a primary diagnosis; weakness, difficulty walking, urinary retention, frequent UTIs and another issue as complications; and chronic pancreatitis and cystonia as secondary contributing conditions. (AR at 59.) He further indicated that this diagnosis would cause continuous exacerbations and downward progression. (Id.) He gave a "fair" prognosis and listed driving, walking further than 100-200 feet and heavy lifting of over 15-20 pounds as limitations. (Id.) Finally, Dr. Muir indicated that Weidauer had a Class 5 physical impairment defined as "severe limitation of functional capacity/incapable of sedentary work." (Id.)

Broadspire assessed Weidauer's application. (AR 161-65.) Broadspire submitted the application and supporting information submitted by Weidauer to two peer review physicians who were asked to determine whether the job description and peer to peer (when applicable) support a functional impairment beginning March 18, 2005. (AR at 166, 170.) One peer review physician was Dr. Vaughn Cohan, a neurology specialist and the other was Dr. Tamara Bowman, a specialist in internal medicine and endocrinology. (Id.)

Dr. Cohan concluded that, while the diagnosis of multiple sclerosis is suspected, it has not been confirmed and that Weidauer's physical exam findings are not indicative of a neurologic impairment which would keep her from performing her own sedentary job. (AR at 168.) Dr. Cohan also concluded that, "the documentation does not demonstrate objective

evidence of a functional impairment for the claimant's own sedentary occupation beginning 3/18/2005." (Id.)

Dr. Bowman concluded that there was no documentation of a change in Weidauer's status regarding urinary retention and infections that would preclude the performance of her essential job duties. (AR at 172.) Dr. Bowman further discussed other documentation and the lack thereof and summarized that, "from an internal medicine standpoint, there are insufficient objective clinical findings documented to support a level of functional impairment that would render the claimant unable to perform her own occupation, from 3/18/05 onward." (Id.)

After reviewing the documentation submitted by Weidauer and the two peer reviews, Broadspire, as the self-proclaimed claim administrator, determined that Weidauer was not precluded from performing the essential functions of her own occupation. (AR at 161-65.) Broadspire denied Weidauer's application for LTD benefits in a letter dated August 11, 2005. (Id.)

**E.      Weidauer's Appeal**

On January 6, 2006, Weidauer appealed Broadspire's decision to deny her LTD benefits. She included new documentation including: a letter from her neurologist, Dr. Dennis Sullivan; a missing page three from Dr. Bethoux's report from the Cleveland Clinic; a report of a spinal fluid sample taken on November 2, 2004; additional materials from Dr. Muir and an explanation for why many of her recurring UTIs were not recorded by Dr. Muir; Honda's attendance reports showing a downward trend in her attendance; new documentation from her urologist, Dr. Kassem; and a sleep study regarding her "kicking leg syndrome." Weidauer indicated that she

felt extremely depressed and disorganized due to the multiple sclerosis and chronic pancreatitis and summarized her appeal as follows:

> Due to my depression, memory problems, fatigue, and other M/S symptoms such as leg weakness, stability, fine motor skills, bladder weakness and leg jolting, to name a few, I can not imagine trying to work and be productive and dependable. I would not be a valuable asset to anyone at this point in my life.

Dr. Sullivan wrote on December 6, 2005, that he had diagnosed Weidauer with multiple sclerosis based upon her clinical history, examination, MRI scans and previous laboratory data. (AR at 297-98.) He further indicated that she had multiple sclerosis for a number of years but it had significantly worsened over the past one and one half years. (Id.) She also had, according to Dr. Sullivan, a number of other medical conditions and received medications for a number of other conditions from other physicians. (Id.) Dr. Sullivan concluded that, from a neurologic standpoint, Weidauer was unable to return to the work at Honda that Weidauer described to him. (Id.) Finally, Dr. Sullivan indicated that Weidauer was not safe to return to work; that he was not aware of any gainful employment that Weidauer would be able to perform "at this time" and that it was unlikely that Weidauer would ever be able to return to work (Id.)

Dr. Bethoux, who is also a neurologist, confirmed the diagnosis of multiple sclerosis. (AR at 299-302.) On examination, he observed several physical defects consistent with multiple sclerosis and offered suggestions for relief from fatigue and pain. (Id.)

The AR also includes the results of a neuropsychological examination conducted on May 23, 2006, by Dr. James Gilchrist at the request of Dr. Sullivan. (AR at 647-50.) Dr. Gilchrist administered a series of cognitive tests. (Id.) He concluded that, in general, Weidauer's scores were typically within the Average to somewhat Above Average Range and did not indicate any degree of clinical memory impairment. (Id.) He did however find that Weidauer exhibited a high

degree of depressive symptoms and that it was most likely that Weidauer was exhibiting mental errors due to psychological functioning and not clinical memory impairment due to multiple sclerosis. (Id.)

The AR also includes a report from Cindy Loper ("Loper"), Weidauer's therapist.[3] (AR 652.) Loper administered the Beck Inventory for depression and found that Weidauer scored in the severe range for depression. (Id.)

**F.      Broadspire's Response to Weidauer's Appeal**

Broadspire acknowledged receipt of Weidauer's Appeal on January 12, 2006. (AR at 294.) From January 23, 2006, to June 27, 2006, Weidauer requested five extensions in order to submit additional evidence in support of her LTD claim. (AR at 381, 376, 378-80.) Each of these requests was granted. (Id.)

Broadspire then submitted the information that it had received from Weidauer to five peer reviewers who specialized in internal medicine, psychology, neurology, gastroenterology and physical medicine and rehabilitation. The Policy reserves the right to have Weidauer examined by one or more physicians selected by Lumbermens but no such examinations were scheduled.

One peer review was performed by Dr. Henry Spira, a neurology specialist. (AR at 464-68.) Dr. Spira reviewed the assessments provided by Weidauer. (Id.) He noted that the MRI performed on Weidauer's brain in March of 2005 was not different from the MRI performed in March of 2004 and that the neuropsychiatric evaluation submitted by Weidauer demonstrated

---

[3]The AR includes only a truncated copy of this report. Weidauer has submitted a full copy with her Motion for Judgment On the Administrative Record.

that she was functioning within the average range of overall intellectual abilities. (Id.) Dr. Spira concluded that the documentation submitted by Weidauer did not support a functional impairment that would preclude Weidauer from performing her own sedentary occupation. (Id.)

Another peer review was performed by Dr. Todd Eisner, a gastroenterology specialist. (AR at 470-74.) Dr. Eisner examined the documentation submitted by Weidauer regarding her pancreatitis and found that there was no evidence of any ongoing gastrointestinal complaints related to chronic pancreatitis. (Id.) Dr. Eisner concluded that, from a gastrointestinal standpoint, Weidauer appeared stable without a function impairment that precluded her from performing her own sedentary occupation. (Id.)

A third peer review was performed by Dr. Dennis Mazel, a pulmonology/internal medicine specialist. (AR at 475-79.) After reviewing certain of Weidauer's health conditions including sleep apnea, Dr. Mazel concluded that there was no support for a loss of functionality that would preclude Weidauer from performing the essential duties of her own occupation. He further noted that Weidauer had a history of frequent UTIs complicated by symptoms of dysuria and frequency in voiding small amounts of urine but that there was no documentation of any uresepsis or upper tract disease that would preclude Weidauer from performing the duties of her own sedentary occupation. (Id.) Finally, he noted that there was no documentation as to the intensity or severity of pain or frequency of incontinence. (Id.)

A fourth peer review was conducted by Dr. Elana Mendelssohn, Psy.D., who specializes in clinical and neuropsychology. (AR at 480-84.) Dr. Mendelssohn notes that Dr. Sullivan did not provide specific examination findings or behavioral observations regarding Weidauer's cognitive functioning. (Id.) Dr. Mendelssohn also noted that Dr. Gilchrist opined that Weidauer's

emotional status was likely contributing to her mental errors and that there was no evidence of memory impairment secondary to multiple sclerosis. (Id.) Dr. Mendelssohn concluded that observations by Weidauer's physicians did not suggest the presence of emotional discontrol or behavioral impairments that would preclude Weidauer from performing her own occupation. (Id.) Further, additional documentation did not provide findings or observations to substantiate the presence of cognitive, emotional or behavioral impairments. (Id.) In sum, Dr. Mendelssohn concluded that the information submitted by Weidauer did not support the presence of a functional impairment from a neuropsychological perspective. (Id.)

The final peer review was performed by Dr. Eddie Sassoon, a physiatry specialist. (AR at 485-88.) Dr. Sassoon summarized his findings as follows:

> Although the claimant does have some ataxia of gait, she is able to gait independently, there is no evidence of dependence on assistive devices or any profound weakness. Her strength is 4/5 of the lower extremities and she is able to toe walk and can tandem walk hesitantly. She has no focal intellectual or memory deficits identified on neuropsychological assessment. There is no evidence that she cannot perform her own sedentary position. The claimant's repeat MRIs in 2005 did not reveal any changes from 2004. Based on these findings, there is not evidence of a functional impairment for the time period 3/18/05 through the present that would preclude the claimant from performing her own sedentary occupation titled Engineering Coordinator/Business Planning.

(Id.)

On October 3, 2006, Weidauer's appeal was denied. (AR at 358-60.) This denial came from Aetna Life Insurance Company ("Aetna") who alleged to be the "third party disability claim administrator for the Honda of America Long Term Disability Policy." (Id.)

The denial letter states the Policy definition of disability and identifies the documentation reviewed by Aetna. (Id.) The letter also indicates that Weidauer's file was reviewed by

independent peer physicians specializing in Internal Medicine, Psychology, Neurology,

Gastroenterology and Physiatry. (Id.) Aetna summarized its findings as follows:

> After careful review of the aforementioned documentation, the Aetna Appeal Committee determines that there is a lack of medical/psychological evidence (i.e. abnormal physical exam findings, abnormal diagnostic test results, office notes documenting significant upper extremity abnormalities, result of a mental status examination, cognitive deficits, etc.) to substantiate your disability as of 03/18/05. Therefore, the original decision to deny LTD benefits, effective 03/18/05 has been upheld.…

(Id.) After being denied LTD benefits, Weidauer filed the claim that is now before the Court.

## II.     STANDARD OF REVIEW

A participant or beneficiary of an ERISA qualified plan may bring suit in federal court to

recover benefits due under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). The standard of

review for ERISA claims, such as this one, to recover benefits has oft been repeated by the Sixth

Circuit.

A challenge to the denial of ERISA benefits is ordinarily reviewed de novo.[4] *Smith v.*

*Bayer Corp. Long Term Disability Plan*, 275 Fed. Appx. 495, 504 (6th Cir. 2008)(citing

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). However, if the plan in

question grants discretionary authority to the administrator to determine benefit eligibility, the

challenge to the benefits is reviewed under an arbitrary and capricious standard. *Id.*(citing

*Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 291-92 (6th Cir. 2005)). Because a denial of

ERISA benefits is ordinarily reviewed de novo, the party claiming entitlement to review under

an arbitrary and capricious standard has the burden of proving that the arbitrary and capricious

---

[4]Review is de novo with respect to both the factual determinations and the legal conclusions. *Firestone Tire & Rubber*, 489 U.S. at 115.

standard applies. *Crider v. Highmark Life Ins. Co.*, 458 F. Supp.2d 487, 501 (W.D. Mich. 2006)(citing *Brooking v. Hartford Life and Acc. Ins. Co.*, 167 Fed. Appx. 544, 547 (6th Cir. 2006)).

The Sixth Circuit does not require a plan to use any magic words such as "discretionary" to create discretionary authority for a plan administrator to determine benefits or interpret the plan. *Johnson v. Eaton Corp.*, 970 F.2d 1569, n.2 (6th Cir. 1992). Yet the Sixth Circuit has consistently required "a clear grant of discretion [to the administrator]" before replacing its duty to engage in de novo review with the arbitrary and capricious standard. *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994), *cert. denied*, 513 U.S. 1058 (1994). When considering whether a clear grant of discretion is given, courts are to "focus on the breadth of the administrators' power - their 'authority to determine eligibility for benefits or to construe the terms of the plan." *Perez v. Aetna Life Insurance Co.*, 150 F.3d 550, 555 (6th Cir. 1998)(en banc)(citing *Block v. Pitney Bowes, Inc*. 952 F.2d 1450, 1453 (D.C.Cir. 1992), *cert. denied*, 531 U.S. 814 (2000)).

## A.     De Novo Review

When conducting a de novo review, the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits. *Myers v. Iron Workers District Council of Southern Ohio & Vicinity Pension Trust*, Case No. 2:04-CV-966, 2005 WL 2979472 at *1 (S.D.Ohio Nov. 7, 2005). In doing so, the administrator's decision is accorded no deference or presumption of correctness. *Napier v. Hartford Life Ins. Co.*, 282 F.Supp.2d 531, 534 (E.D. Ky. 2003).

The de novo standard applies to both the factual determinations and the legal conclusions of the plan administrator. *Myers*, 2005 WL 2979472 at &*1. However, the court may not consider new evidence or look beyond the record that was before the plan administrator. *Wilkins*, 150 F.3d at 616.

**B.      Arbitrary and Capricious Review**

An arbitrary and capricious review is "extremely" differential. *Smith*, 275 Fed. Appx. at 504(citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003), *aff'd*, 128 S. Ct. 2343 (2008)). However, when undertaking a review under an arbitrary and capricious standard, an administrator's decision is not merely "rubber stamped." *Id.* A court is to review the quality and quantity of the medical evidence and the opinions of both sides. *Id.*(citing *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006)).

When it is possible to offer a reasoned explanation, based upon the evidence, for a particular outcome, that outcome is not arbitrary or capricious. *Rose v. Hartford Financial Services Group*, 268 Fed. Appx. 444, 449 (6th Cir. 2008)(citing *Hunter v. Claiber Sys., Inc.*, 220 F.3d 702, 710 (6th Cir. 2000)). Said another way, if the decision "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence, the decision will be upheld." *Id.*(quoting *Elliott v. Metropolitan Life. Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006)).

**C.      Determination of the Standard of Review In this Case**

In this case, both Parties agree in their Motions for Judgment On the Pleadings that an arbitrary and capricious standard of review is applicable. Specifically, Weidauer asserts that an arbitrary and capricious standard of review is applicable to Lumbermens' decision but that

Lumbermens has a conflict of interest. Honda and Lumbermens merely assert that an arbitrary and capricious standard applies.

Honda and Lumbermens again assert in their Memorandum In Opposition that an arbitrary and capricious standard applies. However, in her Memorandum In Opposition, Weidauer argues that, since the AR includes no evidence that either Broadspire or Aetna was given a clear grant of discretion, a de novo standard of review applies.

The Plan Booklet (the Policy) provides that, "[p]ayment of benefits is contingent on Your providing proof of loss that We determine to be satisfactory." (AR at 40.) The term "We" is defined in the Plan Booklet as Lumbermens Mutual Casualty Company. (AR at 29.) Therefore, the Plan Booklet provides clear grant of discretion to Lumbermens. *See e.g. Perez*, 150 F.3d at 555-56.

The Summary Plan Booklet indicates that Kemper National Services is the Plan Administrator for Honda's LTD insurance. (AR at 672.) The Summary Plan Booklet also indicates that the Plan Administrator has the discretionary authority to interpret the terms of the plan. (AR at 671.) Therefore, the Summary Plan Booklet gives a clear grant of discretion to Kemper National Services.

The problem is that the decision regarding Weidauer's application for LTD benefits was made by Broadspire (AR at 161-65) and the decision denying Weidauer's appeal of that decision was made by Aetna (AR at 358-60.) The AR includes no clear grant of discretionary authority to Broadspire or Aetna.

Honda and Lumbermens represent that Kemper National Services was the operating name of NATLSCO, a Lumbermens' subsidiary which had been performing plan administration

services for Lumbermens. (Def.'s Mem. p. 4.) NATLSCO was sold to another corporation before Weidauer's LTD claim was made and all of NATLSCO's obligations were transferred to Broadspire. There is, of course, no evidence to support this representation in the AR. However, in *Bennett v. Kemper National Services*, 514 F.3d 547, 552 (6th Cir. 2008), the Sixth Circuit reports that Lumbermens sold Kemper to Broadspire in 2003.

Honda and Lumbermens also represent that Broadspire was sold to Aetna in 2006. (Def's Mem. In Opp. at 3.) In addition, Weidauer identifies a website indicating that Aetna bought Broadspire. (Plt.'s Mem. In. Opp. at 3.) However, as with the alleged sale of NATLSCO, there is no evidence in the AR supporting the sale of Broadspire to Aetna.

In addition to the representations regarding transfer of ownership, Honda and Lumbermens represent that Broadspire and Aetna were performing services pursuant to administrative services agreements. (Def's Mem at 4; Def. Mem. In Opp. at 3.) However the alleged agreements are not a part of the AR.

The AR includes evidence of a clear grant of discretion to Lumbermens and to Kemper National Services. The AR does not include evidence of a clear grant of discretion to Broadspire or Aetna. Even if Honda and Lumbermens' representations regarding the sale of Kemper National Services, the transfer of obligations to Broadspire and the subsequent transfer of obligations to Aetna were true, and the Court has no reason to believe that these representations are not true, a sale and transfer of obligations does not necessarily include a clear grant of discretionary decisionmaking authority.

The AR points to the conclusion that Broadspire and Aetna made the decisions regarding Weidauer's LTD benefits. However, Honda and Lumbermens have not met their burden of

showing that there was a clear grant of discretion to Broadspire or Aetna. Therefore, the denial of LTD benefits to Weidauer will be reviewed de novo.

**D.      Conflict of Interest**

The Parties argue much about whether conflicts of interest exist in this case. A possible conflict of interest becomes an issue when the plan administrator is given a clear grant of discretion and the court is determining whether there is an abuse of discretion. *See e.g. Metropolitan Life Insurance Co. v. Glenn*, 128 S.Ct. 2343, 2348 (2008). However, since a plan administrator's decision is accorded no deference or presumption of correctness when conducting a de novo review, whether there is a conflict of interest in this case is irrelevant.

**E.      Plan Benefit Provisions**

Weidauer is entitled to LTD benefits if she becomes disabled. (AR at 31.) The benefits are payable when Lumbermens receives proof that Weidauer is disabled due to injury or sickness and that Weidauer requires the regular care and attendance of a physician. (Id.) The definition of disability is as set forth above under "Relevant Plan Provisions" and will not be repeated here. (See AR at 27.)

The term "proof" is not defined or discussed in the Policy. Proof, in this context, commonly means the establishment or refutation of an alleged fact by evidence. *Black's Law Dictionary* (8th ed. 2004).

In this case, then, the Court must determine whether Weidauer established by evidence that she was disabled under the Policy definition of disability. In doing so, no deference is given to Broadspire or Aetna's decisions that she was not disabled. Also, in doing so, the Court is limited to the confines of the AR.

### III.   ANALYSIS

The Policy and the Summary Plan Description both require that Weidauer be disabled before she is entitled to LTD benefits. LTD benefits are payable when Weidauer establishes that she is disabled due to injury or illness and requires the regular care and attendance of a physician.

Weidauer is disabled if she is unable to perform each of the material duties of Honda's Business Planning position.[5]

In this case, the basic evidence submitted by Weidauer comes from her treating physicians and specialists. Although not required to do so, the plan administrator elected not to exercise its option to have Weidauer examined by physicians selected by it.

Generally, courts and plan administrators may not ignore the opinions of treating physicians but they are not required to give special deference to them. *Boone v. Liberty Life Assurance Co. Of Boston,* 161 Fed.Appx. 469, 473-74 (6th Cir. 2005). In this case, however, deference must be given to the evidence submitted by Weidauer's treating physicians because they are the only ones who actually examined her.

Dr. Muir was Weidauer's Attending Physician and was board certified in family medicine. His primary diagnosis was multiple sclerosis with complications due to weakness, difficulty walking, urinary retention, frequent UTIs and another issue as complications**.** (AR at 59-60.) His objective findings were DTR's lower extremities, weakness in lower extremities and gait slightly unstable. Subjective symptoms were weakness, a recent flare-up of multiple

---

[5]What is called the "own occupation" definition is used here because the "any occupation" definition does not apply until the claimant has received LTD benefits for 24 months and Weidauer has yet to receive LTD benefits.

sclerosis, frequent UTIs and others. Dr. Muir also identified secondary conditions contributing to Weidauer's condition as chronic pancreatitis and cystonia.

Dr. Muir found that Weidauer was not suitable for vocational rehabilitation because her diagnosis would cause continuous exacerbations and downward progression. He determined that Weidauer could function under stress and engage in interpersonal relationships but was incapable of sedentary work. Finally, Dr. Muir reported that he was seeing Weidauer monthly and had referred her to Dr. Sullivan, a neurologist.

Dr. Sullivan reported a diagnosis of multiple sclerosis based upon Weidauer's clinical history, an examination, MRI scans and previous laboratory data. (AR at 297-98.) He found that Weidauer had multiple sclerosis for a number of years but it had significantly worsened over the past one and one half years.

Dr. Sullivan found that Weidauer demonstrated persistent lower extremity weakness, easily fatigues when walking and has an ataxic quality to her gait making her unsafe to return to work. With regard to her mental status, Dr. Sullivan found a component of mood dysfunction with complaints of increasing cognitive problems of uncertain etiology. He also reported that Weidauer was on Provigil for her fatigue, Wellbutrin for her depression, Mirapex for her "restless leg" syndrome" and Methadone and Percocet for chronic pancreatitis.

Dr. Sullivan concluded that Weidauer was unable to return to work because of her neurologic deficits, her cognitive and psychological deficits, her weakness and coordination deficits and her sensory loss. He found that it was extremely unlikely that she would ever be able to return to any form of gainful employment.

Dr. Muir had also referred Weidauer to Dr. Lehman, a gastroentologist at Indiana University. (AR at 206-08.) He performed an annual followup examination on May 10, 2004. Dr. Lehman had previously determined that Weidauer had mild, chronic pancreatic parenchymal disease as evidenced by endoscopic ultrasound.

On May 10, 2004, Dr. Lehman found that Weidauer had undergone multiple endoscopic procedures and had tried several medications for pain management without any substantial long term benefit. Dr. Lehman was pleased with Weidauer's status from a pancreatic standpoint even though she required scheduled narcotic analgesics for pain management. Based upon Weidauer's recent multiple sclerosis diagnosis, Dr. Lehman declined to make any changes in Weidauer's pancreatic management and noted that the surgical options for long term pain management in the setting of multiple sclerosis are now limited. Weidauer was given prescriptions for both Percocet and Methadone.

In October of 2004, Weidauer went to Dr. Bethoux at the Cleveland Clinic to obtain a second opinion regarding the multiple sclerosis diagnosis. Dr. Bethoux examined Weidauer and confirmed the multiple sclerosis diagnosis. He found sensori-motor deficits and did blood work to rule out possible etiologies other than multiple sclerosis. He recommended increasing the Provigil dosage for Weidauer's fatigue, trying Neurontin for her leg jerks and suggested measurement of post-voiding residual volumes to determine if her current frequency of intermittent catheterization is still adequate.

In May of 2006, Dr. Sullivan referred Weidauer to Dr. James Gilchrist, Ph.D. at Miami Valley Hospital, for a neuropsychological evaluation. (AR at 647-50.) Based upon cognitive tests that he administered, Dr. Gilchrist concluded that, in general, Weidauer's scores were

typically within the Average to somewhat Above Average Range and did not indicate any degree of clinical memory impairment. (Id.) He did however find that Weidauer exhibited a high degree of depressive symptoms and that it was most likely that Weidauer was exhibiting mental errors due to psychological functioning and not clinical memory impairment due to multiple sclerosis. (Id.)

Weidauer also saw Cindy Loper, a Christian Counselor. Loper summarized her work with Weidauer in a letter dated February 13, 2006. Loper administered the Beck Inventory for depression on which Weidauer scored in the severe range. Loper reported witnessing Weidauer's decline in ambulation and memory and noted her fatigue and distractibility. Interventions included Cognitive Behavioral Therapy, Supportive Psychotherapy, Christian counseling, couples treatment and medication review.

Weidauer's records were reviewed by Dr. Henry Spira, a neurology specialist. (AR at 464-68.) Dr. Spira did not examine Weidauer but concluded that the records he was given did not support a functional impairment from a sedentary occupation. His only observation, other than those included in the records provided by Weidauer's examining physicians, was that the results of MRI done is March 2005 were no different from the results of the MRI done in March of 2004. Apparently, Dr. Spira believed that the records indicated that Weidauer's multiple sclerosis was not worsening.

Weidauer's records were also reviewed by Dr. Todd Eisner,  a gastroenterology specialist. (AR at 470-73.) Dr. Eisner did not examine Weidauer but concluded from the records that he was given that Weidauer was able to perform her job as an Engineering Coordinator at Honda from a gastrointestinal standpoint. Dr. Eisner, focusing on Weidauer's chronic

pancreatitis diagnosis, reasoned that since Weidauer had not seen a gastroenterologist since she saw Dr. Lehman in May of 2004 and since she did not mention chronic pancreatitis in her most recent appeal letter as a reason for being incapable of work, there is no evidence of any ongoing gastrointestinal complaints related to chronic pancreatitis. Weidauer appears to Dr. Eisner to be stable without a functional impairment.

Weidauer's records were also reviewed by Dr. Dennis Mazal, a pulmonology/internal medicine specialist. (AR at 475-79.) Dr. Mazal did not examine Weidauer but concluded from the records that he was given that there was no support for a loss of functionality that would preclude Weidauer from performing the essential duties of the Engineering Coordinator position at Honda.

Dr. Mazal noted that Weidauer had been diagnosed with depression, multiple sclerosis, difficulty walking, shoulder pain, chronic pancreatitis, urinary retention and a sleep disturbance. However, he specifically did not comment on psychology, neurology, gastroenterololgy, physical medicine and rehabilitation issues. Dr. Mazal did indicate that there is no documentation of any urosepsis or upper tract disease that would preclude Weidauer from performing the duties of an Engineering Coordinator. He also indicated that there is no documentation as to the intensity or severity of pain or frequency of incontinence. Apparently, from only an internal medicine point of view and based upon the records provided to him, Dr. Mazal concluded that Weidauer could perform the duties of the Engineering Coordinator position at Honda.

Weidauer's records were also reviewed by Dr. Elana Mendelssohn, Psy.D., who specializes in clinical and neuropsychology. (AR at 480-84.) Dr. Mendelssohn did not address

the impact of chronic pancreatitis, urinary retention, walking difficulties and shoulder pain. She did, however, determine that the records that she was provided did not support the presence of a functional impairment from a neuropsychological perspective. Dr. Mendelssohn found "sparse" reports of depression and cognitive difficulties. Apparently referring to the neurological evaluation performed by Dr. Gilchrist, Dr. Mendelssohn concluded that Weidauer's cognitive abilities were generally within the average range. Dr. Mendelssohn also concluded that additional documentation did not provide findings or observations to substantiate the presence of cognitive, emotional or behavioral impairments.

Finally, Weidauer's records were reviewed by Dr. Eddie Sasson, M.D., a physiatry specialist. (AR at 485-88.) Dr. Sasson, based upon the records provided to him, found that there was no evidence that Weidauer could not perform the duties of the Engineering Coordinator position at Honda. He based this conclusion on what he found in the record to be: no change in Weidauer's MRI from 2004 to 2005; Weidauer's ability to gait independently, although with some axtia of gait; no evidence of dependence on assistive devices or any profound weakness; and no identified focal intellectual or memory deficits.

## IV.    CONCLUSION

Weidauer has submitted evidence that she was unable to perform the duties of the Engineering Coordinator position at Honda due to several illnesses and that she was under the regular care of a physician. She had multiple sclerosis with complications due to weakness, difficulty walking, urinary retention, frequent UTIs, chronic pancreatitis and cystonia. In addition, she fatigued easily, had cognitive and psychological deficits, had coordination deficits, had sensory loss and was taking a variety of prescription drugs for treatment of her illnesses.

Most, if not all, of Weidauer's illnesses were confirmed by opinions other than that of her Attending Physician. Thus, Weidauer has submitted evidence that she was disabled in accordance with the Policy.

Although the Plan Administrator elected not to conduct an independent medical examination, it did elect to conduct five peer reviews by specialists in very specific areas. These peer reviews are in the AR and thus are considered. However, they are unavailing and, at times, disingenuous.

Peer reviewer Dr. Spira listed Weidauer's medical records followed by a conclusion. He does not discuss Weidauer's complaints of fatigue, depression and pain, all of which are common to those who have multiple sclerosis. Also, it appears that Dr. Spira's report is internally inconsistent with regard to the close-in-time opinions of Drs. Sullivan and Bethoux.

Peer reviewer Dr. Eisner's conclusion that Weidauer was not disabled focuses on her chronic pancreatitis diagnosis. Dr. Eisner found Weidauer was not disabled due to chronic pancreatitis primarily because she did not mention chronic pancreatitis on her appeal form and there was no evidence of ongoing gastrointestinal complaints. Yet the records submitted by Weidauer indicated that she had chronic pancreatitis and there is no indication that it had gone away.

Peer reviewer Dr. Mazel noted many of Weidauer's illnesses. He found no documentation of any urosepsis or upper tract disease but failed to explain the relevance of this finding. He also indicated that there was no documentation of the intensity or severity of Weidauer's pain. There is, however, documentation that she was in pain.

Peer reviewer Dr. Mendelssohn concluded that there were no findings or observations to substantiate the presence of cognitive, emotional or behavioral impairments. Yet, there was.

Peer reviewer Dr. Sasson observed no change in Weidauer's MRI from 2004 to 2005 but failed to provide the significance of this observation. He also found no evidence of "profound" weakness yet there is evidence of weakness. He also found no identified focal intellectual or memory deficits. Yet there is evidence of a "high degree" of depressive symptoms and mental errors due to psychological functioning. There is also evidence that Weidauer scored in the "severe" range on the Beck Inventory, a self-administered test.[6]

Finally, the Plan Administrator did not provide any analysis of the combined impact of all of Weidauer's illnesses on her ability to perform the duties of the Engineering Coordinator position at Honda. The Plan Administrator also failed to provide an analysis of the combined impact of all of the prescription drugs that Weidauer was taking or the impact of her pain on her ability to perform.

The AR contains evidence that Weidauer was disabled in accordance with the terms of Policy. The Plan Administrator has incorrectly determined that she was not. The remaining issue is the appropriate remedy.

Once a court determines that a claimant is entitled to benefits, it must decide whether the claim should be remanded for further proceedings or an award of benefits should be entered. *Cooper v. Life Insurance Co. of North America*, 486 F.3d 157, 171 (6th Cir. 2007). A remand is appropriate "where the problem is with the integrity of the plan's decision-making process,

---

[6]Claims of a psychiatric (subjective) nature are particularly inappropriate for a paper review. *Smith v. Bayer*, 275 Fed. Appx. 495, 508 (6th Cir. 2008). Yet, while Weidauer made claims of a psychiatric (subjective) nature, the Plan Administrator conducted only a paper review.

rather than that a claimant was denied benefits to which he was clearly entitled." *Id.*(citing *Elliott v. Metropolitan Life Insurance Co.*, 473 F.3d 613, 622 (6th cir. 2006)).

In this case, there no issue with the plan's decision-making process that has been addressed because the AR was reviewed de novo. Therefore, the appropriate remedy is to award benefits.

Honda and Lumbermens' Motion for Judgment On the Administrative Record (doc. #23) is OVERRULED and Weidauer's Motion for Judgment On the Administrative Record (doc. #24) is GRANTED. Weidauer is hereby awarded the LTD benefits to which she is entitled under the "own occupation" definition of disability included in the Policy.

Finally, Weidauer is given until not later than thirty days from entry of this Order to submit a motion requesting any attorneys' fees and other benefits to which she may believe that she is entitled under ERISA. This motion should be supported by appropriate evidence and reference to legal authorities. The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this 27th day of October, 2008.

**\*S/THOMAS M. ROSE**

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record